# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3486

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District |
| | * | of Nebraska. |
| Juan Angulo-Guerrero, also known | * | |
| as Ramon Rocha-Lara, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  March 11, 2003

Filed:  May 8, 2003

_____

Before McMILLIAN, FAGG, and LOKEN,* Circuit Judges.

_____

FAGG, Circuit Judge.

Juan Angulo-Guerrero, a passenger on a Greyhound bus, told a government agent conducting an immigration inspection that he was in the United States illegally and that he had been previously deported. Angulo-Guerrero was arrested and charged with illegally reentering the United States following deportation. See 8

_____

*The Honorable James B. Loken became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2003.

U.S.C. § 1326. After the district court[**] denied his motion to suppress his statements to the officer, Angulo-Guerrero conditionally pleaded guilty. Angulo-Guerrero now appeals the denial of his motion to suppress, and we affirm.

Angulo-Guerrero was a passenger on a bus that arrived in Ogallala, Nebraska, for a scheduled stop and driver exchange. Before any passengers got off the bus, special agents Johnson and Sattly boarded. They were wearing jackets bearing Immigration and Naturalization Service (INS)[***] insignia, and were armed but did not display their weapons. The agents were conducting an immigration inspection operation on all east- and west-bound busses with scheduled stops at Ogallala, and explained this to the driver. Standing in the aisle at the front of the bus with Sattly behind him, Johnson explained to the passengers in both English and Spanish, "[T]his is an immigration inspection and when I approach you just state whether you're a United States citizen or not. And if [you are] not please have [your] immigration documents ready for inspection." Four to six passengers came forward and asked if they could leave the bus. Johnson asked the passengers whether they were American citizens. They responded affirmatively and left. Moving down the aisle towards the back of the bus, Johnson next came to Angulo-Guerrero, who was seated two rows behind the driver, and asked him in English whether he was a United States citizen. Angulo-Guerrero did not reply. Believing Angulo-Guerrero did not understand English, Johnson asked Angulo-Guerrero in Spanish where he was born. Angulo-Guerrero responded he was born in Mexico. Johnson then asked whether Angulo-Guerrero had any immigration documents, and Angulo-Guerrero said he did not. Johnson also asked Angulo-Guerrero whether he was in the United States legally or illegally. Angulo-Guerrero admitted he was here illegally, and Sattly escorted

---

[**]The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska.

[***]The enforcement units of the INS have been incorporated into the Directorate of Border and Transportation Security of the Department of Homeland Security.

Angulo-Guerrero off the bus. After Johnson finished questioning the other passengers, he stepped off the bus and asked Angulo-Guerrero whether he had ever been deported. Angulo-Guerrero admitted he had.

On appeal, Angulo-Guerrero contends his motion to suppress should have been granted because the immigration inspection was an investigative detention without reasonable suspicion of criminal activity. According to Angulo-Guerrero, the inspection was conducted in the close confines of a bus in a manner that restricted the passengers' movement and indicated that compliance with the agents was required.

The Supreme Court has recently explained the guiding legal principles:

> Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage–provided they do not induce cooperation by coercive means. If a reasonable person would feel free to terminate the encounter, then he or she has not been seized.

United States v. Drayton, 122 S. Ct. 2105, 2110 (2002) (citations omitted). The mere fact that police questioning takes place in the "cramped confines of a bus" does not transform the questioning into a seizure. Florida v. Bostick, 501 U.S. 429, 439 (1991). The Fourth Amendment is implicated only when a reasonable person would believe he or she is not free not to respond to the officer's questions, viewed from the totality of the circumstances. See id. at 439-40.

Applying these principles, the Supreme Court held no seizure occurred when officers boarded a bus during a scheduled stop and began questioning passengers about their travel plans and baggage in a routine drug and weapons interdiction effort.

-3-

Drayton, 122 S. Ct. at 2112. The officers gave the passengers no reason to believe they were required to answer the officers' questions, and did not brandish weapons or make any intimidating movements. Id. The officers questioned the passengers one by one, and nothing the officers said would have suggested to a reasonable person that he or she was barred from leaving the bus or otherwise terminating the encounter. Id. The fact that one of the officers stood at the front of the bus did not tip the scale in the defendant's favor. Id.

In another case, the Supreme Court held INS questioning of factory workers in their workplace about their citizenship was not a seizure even though uniformed INS agents were posted at the workplace exits and the workers were not told they need not respond. I.N.S. v. Delgado, 466 U.S. 210, 211-12, 217 (1984). The Court stated, "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." Id. at 216. The Court noted there was nothing in the record showing the agents stationed at the factory doors prevented anyone from leaving, and the obvious purpose of the agent's presence at the doors was to ensure all the workers were questioned. Id. at 218.

Given these precedents, we conclude Angulo-Guerrero was not seized when he answered Johnson's questions on the bus. Johnson was moving down the aisle from the front towards the back of the bus to make sure all passengers were questioned and not to prevent them from leaving. Indeed, some passengers got up to leave and did so. The fact that Johnson asked them whether they were American citizens does not turn the encounter into a detention or seizure. Further, the fact that Johnson asked Angulo-Guerrero in Spanish where he was from after Angulo-Guerrero did not respond to his question in English did not constitute a show of authority creating a reasonable belief Angulo-Guerrero was not free to leave. There is simply no evidence that passengers would be detained if they refused to answer Johnson's questions. Likewise, the agents' appearance did not contribute to an

atmosphere of coercion. The agents simply wore badges identifying themselves, and did not display their guns. Considering the totality of the circumstances, we conclude the district court properly denied Angulo-Guerrero's motion to suppress.

We thus affirm the district court.

LOKEN, Chief Judge, concurring.

I join the opinion of the court. But like Justice Powell, concurring in INS v. Delgado, 466 U.S. 210, 221-24 (1984), I believe the district court's suppression ruling must also be affirmed on an alternative ground. Given the government's important interest in enforcing the nation's immigration laws, I conclude that it was constitutionally reasonable for the INS agents to detain Angulo-Guerrero for the limited purpose of questioning him about his citizenship, whether or not the agents had his consent or reasonable suspicion of criminal activity.

Congress has granted broad powers to those who enforce our immigration laws, including the power "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States [and] to arrest any alien in the United States, if [the agent] has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained." 8 U.S.C. § 1357(a)(1) and (2). Beginning thirty years ago, the Supreme Court considered the constitutional validity of these search and seizure powers in a series of cases involving stops and searches of automobiles that might be transporting illegal aliens. In Almeida-Sanchez v. United States, 413 U.S. 266, 268 (1973), the Court explained:

> The Border Patrol conducts three types of surveillance along inland roadways, all in the asserted interest of detecting the illegal importation of aliens. Permanent checkpoints are maintained at certain nodal intersections; temporary checkpoints are established from time to

time at various places; and finally, there are roving patrols such as the one that stopped and searched the petitioner's car.

In Almeida-Sanchez, a closely divided Court held that the warrantless search of a car stopped by a roving patrol violated the Fourth Amendment.

Two years later, the Court held in United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975), that "[e]xcept at the border and its functional equivalents, officers on roving patrol may stop vehicles [to question occupants] only if they are aware of specific articulable facts . . . that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." In the companion case of United States v. Ortiz, 422 U.S. 891, 896-97 (1975), the Court, applying Almeida-Sanchez, held "that at traffic checkpoints removed from the border and its functional equivalents, officers may not search private vehicles without consent or probable cause." But the Court expressly noted that the rule in Almeida-Sanchez might not apply to checkpoint *stops*. Although the regularity of the procedures attending a checkpoint cannot "mitigate the invasion of privacy that a search entails," the Court explained, "the differences between a roving patrol and a checkpoint would be significant in determining the propriety of the stop, which is considerably less intrusive than a search." Ortiz, 422 U.S. at 895.

One year later, the Court confirmed the importance of this distinction in United States v. Martinez-Fuerte, 428 U.S. 543 (1976). The Court held that the Fourth Amendment is not violated when immigration agents, acting without consent or individualized suspicion, routinely stop automobiles at a permanent checkpoint away from the border with Mexico and refer a small percentage of the stopped vehicles to a secondary inspection area for routine inquiry into the occupants' residence status.

In my view, this case is controlled by the Supreme Court's analysis in Martinez-Fuerte. At the suppression hearing, the government placed in evidence a

January 2002 internal INS operations plan explaining that, based upon preliminary surveillance of the twelve regularly scheduled buses stopping daily at the Ogallala rest stop, the INS Omaha District suspected "that this mode of transportation is regularly being utilized by a growing number of undocumented aliens and by organized smugglers to move groups of aliens through the United States via the I-80 corridor [and] that the use of this mode of transportation has increased since security at Airports has been tightened." Accordingly, the operation plan assigned nine INS agents to board each bus as it stopped at Ogallala on January 29 and 30, 2002, to determine the alienage of each passenger.

The operation plan reflects an agency decision to make the Ogallala bus stop a two-day temporary checkpoint at which bus travelers would be briefly questioned about their residence status. For Fourth Amendment purposes, the resulting intrusion was truly minimal. Unlike what occurs at an automobile checkpoint (whether permanent or temporary), the agents did not interrupt travel by stopping the buses. They were already stopped for a scheduled break. Without extending the stop or significantly interfering with the travelers' break time, the agents briefly questioned the passengers about their citizenship. Compare Delgado, 466 U.S. at 224 (Powell, J., concurring) (factory workers "diverted briefly to answer a few [survey] questions"). Such brief questioning regarding citizenship is a minimal intrusion on the bus travelers' privacy interests compared to the government's substantial interest in controlling illegal immigration. See Brignoni-Ponce, 422 U.S. at 880.

Not only was the intrusion minimal, the District operation plan, like the establishment of a permanent checkpoint, limited the discretion of INS agents in the field to select which bus passengers would be questioned. See Martinez-Fuerte, 428 U.S. at 559. In addition, although the Ogallala stop is a considerable distance from the border with Mexico, the operation plan established a nexus between the two-day questioning of bus passengers and the government's substantial interest in controlling illegal immigration. In our highly mobile society, the government may reasonably

choose to control illegal immigration by monitoring common routes that illegal aliens use to travel when seeking jobs in the interior. In that regard, the location of permanent and temporary checkpoints must be left largely to the discretion of INS officials, subject to judicial review of a particular stop for constitutional reasonableness. See Martinez-Fuerte, 428 U.S. at 559 and n.13.

For these reasons, I conclude that the INS agents' limited questioning of Angulo-Guerrero on the stopped bus was constitutionally reasonable, even if it was a brief, non-consensual seizure conducted without reasonable suspicion that criminal activity was afoot.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.