# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1764

_____

United States of America,          *
                                   *
            Appellant,             *
                                   *   Appeal from the United States
      v.                           *   District Court for the
                                   *   District of Nebraska.
Trinidad Villa-Gonzalez and        *
Jose Manuel Villa-Gonzalez,        *
                                   *
            Appellees.             *

_____

Submitted: May 11, 2010
Filed:  November 1, 2010 (corrected 11/02/10)

_____

Before WOLLMAN, BYE, and MELLOY, Circuit Judges.

_____

BYE, Circuit Judge.

Brothers Trinidad Villa-Gonzalez (Trinidad) and Jose Villa-Gonzalez (Jose) were indicted in 2008 on various criminal charges after police discovered methamphetamine, guns, money, and scales during a search of the brothers' residence. The district court[1] granted the brothers' motion to suppress the physical evidence discovered during the search of their residence, as well as certain incriminating statements they made to police. The government appeals, arguing the district court

_____

[1]The Honorable Joseph F. Bataillon, Chief Judge, United States District Court for the District of Nebraska.

erred by concluding (1) Trinidad's initial encounter with the police was not consensual and statements he made during the encounter were involuntary, and (2) the evidence discovered during the search of the brothers' residence was inadmissible fruit of the poisonous tree. We affirm.

I

Keith Bignell, a drug investigator with the Nebraska State Patrol, received information in February 2008 that Trinidad and Jose Villa-Gonzalez were selling methamphetamine out of their trailer residence on 61st Avenue in Columbus, Nebraska. While driving by the trailer on the morning of May 29, 2008, Bignell saw a vehicle at the trailer and a person standing near the trailer. Bignell decided to attempt a "knock and talk" consensual contact at the residence. Bignell was driving an unmarked sedan at the time and was accompanied by Investigator Molczyk of the Columbus police. Bignell was armed with a pistol in a holster visible on his belt; he was wearing blue jeans, a t-shirt, and a vest displaying a badge emblem and marked with the word "police." Molczyk was wearing plainclothes with no visible weapon.

Before he approached the trailer, Bignell called for assistance and was joined by a uniformed officer, Trooper Dain Hicks, who was driving a marked patrol car. Trooper Hicks was visibly armed. As Bignell and the other officers approached the trailer, Bignell saw an individual later identified as Esau Valenzuela-Machado standing near the trailer. Bignell asked Valenzuela-Machado for identification, and Valenzuela-Machado provided a Mexican voter registration card. Bignell asked Valenzuela-Machado to accompany Trooper Hicks to the front of the trailer. Hicks then placed Valenzuela-Machado in the rear seat of his police cruiser and stood in the driveway near the front of the trailer.

Bignell and Molczyk approached the main door of the trailer and knocked. Jose answered the door. Bignell, standing on a deck outside the main door of the trailer,

identified himself as a police officer, and he asked Jose for "some identification." Bignell also asked if he could come inside the trailer. Jose did not answer, but Trinidad came to the door and told Bignell he could not come inside. Bignell asked Trinidad for identification, and Trinidad responded by closing the door partially and leaving the doorway area. Trinidad then returned with a Nebraska identification card. Bignell and Trinidad then engaged in a brief conversation on the deck during which Trinidad told Bignell that he lived in the trailer along with his brother Jose. Jose returned to the door with his identification – a State of Washington driver's license – handed the ID to Trinidad, and returned once again inside the trailer. Trinindad handed over his and Jose's ID cards to Bignell. Trinidad asked Bignell what he wanted, and Bignell explained that he believed Trinidad and Jose were drug dealers. Trinidad denied the accusation. In response to a few more questions from Bignell, Trinidad stated that he was born in Mexico and that he did not have any additional forms of identification. Bignell asked Trinidad a second time for permission to search the trailer, and Trinidad again declined to consent to a search.

Bignell returned to his car and used his cell phone to call Mike Becker, an Immigration and Customs Enforcement (ICE) officer with the Department of Homeland Security in Omaha, and asked him to run immigration checks based on the information provided by the three men at the trailer. Becker ran the requested checks and called Bignell back in "five minutes or less." At that time, Becker told Bignell he wanted to speak with each of the individuals on the cell phone. While Bignell was talking with Becker, Trinidad stood just "outside the trailer on the deck with Investigator Molczyk." Pursuant to Becker's request to speak with each of the three men, Bignell "approached Trinidad on the — on the deck and handed him the cell phone." The nature of the interaction between Bignell and Trinidad is disputed by the parties. The district court found that Bignell "told" Trinidad to talk on the phone with Becker. The government asserts that this finding is clearly erroneous, and suggests, instead, that Bignell merely handed the phone to Trinidad. If Bignell said anything to Trinidad when he handed Trinidad the phone, the record is silent on the point.

-3-

In a "short conversation," Trinidad told Becker he was from Mexico, that he had entered the United States on a visitor's visa in June 2007, and that his documents were in the trailer. After Becker finished speaking to Trinidad, Bignell then entered the trailer, without consent, and handed the phone to Jose. Jose admitted to his status as an illegal immigrant. Finally, Bignell handed the phone to Valenzuela-Machado, who also admitted to his status as an illegal alien. At the conclusion of Becker's cell phone conversation with the men, Becker told Bignell to administratively arrest all three men as suspected illegal aliens, on the basis of Jose and Valenzuela-Machado's admission of their illegal status, and Becker's failure to find any record in his immigration database corroborating Trinidad's statement that he entered the United States on a visitor's visa in June 2007.

At this point, Bignell handcuffed Trinidad and placed him under arrest.[2] The three detained men were taken to the Platte County jail where Becker and another ICE investigator promptly arrived from Omaha to interview them regarding their immigration status. With respect to Trinidad, the government's computer records did not support his claim that he had lawfully entered the country, but Becker wanted to interview him because "sometimes there can be errors in databases." Becker testified the general purpose of his interviews with suspected illegal aliens is to seek information for administrative removal from the United States. Becker testified he conducts an "identity interview" addressing the person's

> name, date of birth, family's name, do they have kids, are they married, are they sick, where do they live, where were they born, and then we have their entry data, because under the Immigration and Nationality Act, how an alien enters the United States determines [] which course of action that you actually take in the administrative process . . . for removal.

---

[2]The record is silent on when, if ever, Bignell returned Trinidad and Jose's identification cards.

Becker does not typically give <u>Miranda</u> warnings at the outset of these interviews, and he did not do so when he interviewed Trinidad at the jail. When Becker interviewed Trinidad, he inquired about the names of Trinidad's parents and his exact address in Mexico. When Becker told Trinidad the government did not have a record of him coming into the United States with a passport and visa as he had claimed, Trinidad incriminated himself, admitting he used fraudulent documents to gain entry. Because Trinidad appeared to Becker to have admitted to committing a felony by fraudulently using another person's documents to enter the United States, Becker immediately stopped questioning Trinidad.

On the assumption Trinidad likely kept the fraudulently-used documents at his residence, Becker decided to seek a warrant to search for such documents in Trinidad and Jose's trailer. The government applied for and obtained a search warrant, with the probable cause showing for the warrant based principally on Trinidad's disclosure that he had fraudulently used another person's documents to illegally enter the United States, along with his earlier statement that he stored the documents in his trailer. The warrant affidavit also relied on the fact that both Jose and Valenzuela admitted to their status as illegal aliens.

The search warrant for the trailer was executed at around 6 p.m. on the same day, May 29, 2008, by Becker and other ICE agents, along with Bignell and Molczyk. In the residence, officers discovered about $32,000 in currency, two handguns, two scales, and a quantity of methamphetamine.

On June 18, 2008, a federal grand jury in the District of Nebraska returned a five-count indictment against Trinidad and Jose. Count One charged both Trinidad and Jose with conspiring to distribute and possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count Two charged both Trinidad and Jose with possessing methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Count Three charged both Trinidad

and Jose with unlawful possession of firearms by an alien illegally in the United States, in violation of 18 U.S.C. § 922(g)(5)(A). Count Four charged Trinidad with unlawfully reentering the United States after having been deported following conviction for an aggravated felony, in violation of 8 U.S.C. § 1326. Count Five was a forfeiture count under 21 U.S.C. § 853.

In September 2008, Trinidad and Jose filed motions to suppress all their statements to law enforcement officers as well as the evidence seized in the search of their residence. A magistrate judge conducted an evidentiary hearing on Trinidad and Jose's suppression motion and entered a Report and Recommendation recommending that the motions be granted in part and denied in part. The magistrate concluded the initial "knock and talk" interaction between Bignell, Trinidad and Jose was a consensual encounter and found no reason to suppress Trinidad's cell phone conversation with Becker. The magistrate judge found that Bignell had "approached Trinidad on the deck and handed him a cell phone, at which time Trinidad spoke with Officer Becker," and he noted that "[t]here is no evidence that Trinidad objected to talking to Becker on the telephone or that he was forced to do so." The magistrate judge further concluded Trinidad was not "in custody" when he talked to Becker on the cell phone. The magistrate judge also found that because Becker was unable to find any record that Trinidad had entered the United States with a passport and visa in 2007 as he had claimed, Becker had sufficient cause at the conclusion of the cell phone conversation to direct Bignell to make an administrative arrest and detain Trinidad. Turning to Becker's questioning of Trinidad at the jail, the magistrate judge concluded Becker should have provided <u>Miranda</u> warnings to Trinidad. In the magistrate judge's view, Becker's questioning of Trinidad as to his manner of entry – in which he confronted Trinidad with the fact that the government's records did not support his claim that he used a passport and visa to legally enter in 2007 – was "reasonably likely to elicit an incriminating response," and <u>Miranda</u> warnings were therefore required. The magistrate judge contrasted Becker's interrogation at the jail from the "mere[] . . . administrative inquiry [conducted] when Becker interviewed

-6-

Trinidad over the telephone." Because of Becker's failure to provide <u>Miranda</u> warnings prior to the jail interview, the magistrate judge recommended that Trinidad's statements in that interview be suppressed. Relying on <u>United States v. Patane</u>, 542 U.S. 630, 636 (2004), the magistrate judge rejected Trinidad and Jose's argument that the "fruit of the poisonous tree" doctrine required suppression of the physical evidence later seized at the trailer. The magistrate judge explained, under <u>Patane</u>, there is no constitutional basis for suppressing physical evidence obtained as a result of voluntary statements, even if there was a <u>Miranda</u> violation in the jailhouse questioning. Assessing the totality of the circumstances, the magistrate judge concluded Trinidad's statements at the jail were voluntary. The magistrate judge noted in particular that "[t]he record in this case is devoid of any indication that either Trinidad or Jose were particularly susceptible to pressure that may have been asserted by law enforcement," and that "[t]he evidence does not suggest that their wills were overborne at any time during these events." Finally, the magistrate judge concluded that the facts included in the application for the search warrant, including Trinidad's statements, were sufficient to establish probable cause for the search of the trailer for evidence of immigration law violations.

The district court subsequently entered a suppression order granting Trinidad and Jose's motion to suppress in its entirety. The district court agreed with the magistrate judge that the incriminating statements Trinidad made at the Platte County jail required <u>Miranda</u> warnings and must be suppressed. In addition, however, the district court found that although Bignell's initial contact with Trinidad was consensual, the encounter became an unlawful detention at the time of Trinidad's cell phone conversation with Becker. In addition, the district court concluded Trinidad was "in custody" on the deck of his residence and that <u>Miranda</u> warnings were therefore required before his cell phone conversation with Becker. The district court further found the government had failed to prove the voluntariness of Trinidad's statements in light of the coercive atmosphere and the fact that "the defendants were told, not asked, to answer the questions propounded by the ICE officer on the phone."

Because the information supporting probable cause for the search warrant was derived from the arrest which resulted from what were, according to the district court, Trinidad's involuntary statements to Becker on the cell phone during a period of unlawful detention, the court ultimately concluded that the fruit of the poisonous tree doctrine required suppression of the physical evidence seized in the search.

The government now appeals the district court's adverse suppression order. We have jurisdiction over the government's appeal pursuant to 18 U.S.C. § 3731.

II

The first issue we must confront is whether Trinidad was seized within the meaning of the Fourth Amendment by the time he made an incriminating statement over the phone to Becker.

We review a district court's factual determinations in ruling on a motion to suppress for clear error and its conclusions of law de novo. United States v. Griffith, 533 F.3d 979, 982 (8th Cir. 2008).

Although the Fourth Amendment prevents police from seizing a person without a reasonable suspicion of criminal activity, the Amendment is not triggered by a consensual encounter between an officer and a private citizen. Id. at 983. "[M]ere police questioning does not constitute a seizure." Florida v. Bostic, 501 U.S. 429, 434 (1991). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search . . . provided they do not induce cooperation by coercive means. If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." United States v. Angulo-Guerrero, 328 F.3d 449, 451 (8th Cir. 2003). "A consensual encounter becomes a seizure implicating the Fourth Amendment when, considering the totality of the circumstances, the questioning is 'so intimidating,

-8-

threatening, or coercive that a reasonable person would not have believed himself free to leave.'" United States v. Flores-Sandoval, 474 F.3d 1142, 1145 (8th Cir. 2007), quoting United States v. Hathcock, 103 F.3d 715, 718 (8th Cir. 1997).

Two relevant Supreme Court cases bear examination. In United States v. Drayton, the Supreme Court held no seizure occurred when officers boarded a bus during a scheduled stop and began questioning passengers about their travel plans and baggage in a routine drug and weapons interdiction effort. 536 U.S. at 196. And while the police officers in Drayton were not in uniform or visibly armed, the Court stated that "those factors should have little weight in the analysis." Id. at 204. The Court noted that

> [o]fficers are often required to wear uniforms and in many circumstances this is cause for assurance, not discomfort. Much the same can be said for wearing sidearms. That most law enforcement officers are armed is a fact well known to the public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon.

Id. at 204-05. The Court ruled the encounter was not a seizure within the meaning of the Fourth Amendment. Id. at 207.

In another case, the Supreme Court held INS questioning of factory workers in their workplace about their citizenship was not a seizure even though uniformed INS agents were posted at the workplace exits and the workers were not told they need not respond. I.N.S. v. Delgado, 466 U.S. 210, 216 (1984). The Court stated, "[w]hile most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." Id. The Court noted there was nothing in the record showing the agents stationed at the factory doors prevented anyone from leaving, and the

obvious purpose of the agent's presence at the doors was to ensure all the workers were questioned.  Id. at 218.

This court has also affirmed on numerous occasions that the knock-and-talk procedure used here is a consensual encounter under normal circumstances.  See, e.g., United States v. Spotted Elk, 548 F.3d 641, 655 (8th Cir. 2008) ("As commonly understood, a knock and talk is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion.") (citations omitted); United States v. Vera, 457 F.3d 831, 835 (8th Cir. 2006) (indicating that a request to see identification is not a seizure, as long as the police do not convey a message that compliance with their request is required); United States v. Coney, 456 F.3d 850, 858 (8th Cir. 2006) (finding encounter with police officer consensual where officer "did not use physical force, make a show of authority, or use demanding language," and two defendants exercised their right to deny request for consent to search).

In making the ultimate determination of whether a reasonable person would feel free to terminate the encounter with police, we have in past cases examined the presence or absence of seven nonexclusive factors.  In Griffith, we stated that

> [s]ome circumstances which inform our decisionmaking include: officers positioning themselves in a way to limit the person's freedom of movement, United States v. White, 890 F.2d 1412, 1416 (8th Cir. 1989), the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation, Ninety One Thousand Nine Hundred Sixty Dollars, 897 F.2d at 1461.

Griffith, 533 F.3d at 983.

Turning to the facts of this case, we conclude the district court did not err when it concluded Trinidad was seized by the time he spoke to Becker on the phone. To be sure, two of the relevant factors support the government's argument that the encounter between Trinidad, Jose, and the police remained a consensual encounter. First, there is no evidence in the record that any physical touching occurred, and second, there was no language or intonation used indicating compliance was necessary.[3] Five of the relevant factors, however, weigh in favor of Trinidad and Jose.[4] Three officers were present at the trailer. The officers in this case positioned themselves so as limit Trinidad and Jose's freedom of movement. Trooper Hicks described his role as "security" and stood in the driveway as Bignell and Molczyk went to the door of the trailer. When Bignell returned to his vehicle to phone Becker, Molczyk remained near the trailer door with Trinidad. Although we do not give the circumstance a great deal of weight, see Drayton, 536 U.S. at 204-05, two of the officers were visibly armed. The two remaining factors weigh most heavily in our analysis. First, in the course of the encounter, Bignell told Trinidad he believed Trinidad and Jose were drug dealers. Such inquisitorial statements are not present in the vast run of consensual encounters between police and individuals, and certainly make any encounter more coercive. See United States v. Drinkard, 900 F.2d 140, 142 (8th Cir. 1990) (concluding a seizure occurred where DEA agents asked the defendant if he had drugs in his luggage). Second, there is no indication that Bignell ever returned Trinidad's identification card before Trinidad spoke to Becker over the phone.[5] Without his identification card, a

---

[3]Because we conclude the remaining circumstances are sufficient to support the district court's conclusion Trinidad was seized, we assume, without deciding, that the district court clearly erred when it found that Bignell "told" Trinidad to speak on the phone to Becker.

[4]We emphasize that we do not apply any rigid mathematical formula with respect to the relevant factors in our analysis. We count factors merely to organize our analysis.

[5]The factual record is clear that Bignell took possession of Trinidad and Jose's identification cards during the early stages of the encounter. The record is silent,

reasonable person is much less likely to believe he can simply terminate a police encounter.  See Florida v. Royer, 460 U.S. 491, 503 n. 9 (1983) (noting that officers taking possession of defendant's airline ticket, luggage, and identification contributed to the determination defendant had been seized because "[a]s a practical matter, Royer could not leave the airport without them.").  Looking at all the circumstances, we agree with the district court that a reasonable person in Trinidad's circumstances would not have felt free to terminate the police encounter and walk away (or attempt to do so).  Therefore, the district court did not err when it concluded Trinidad was seized within the meaning of the Fourth Amendment by the time he spoke to Becker on the phone.[6]

---

however, on if, and, more importantly when, Bignell returned the cards to the brothers.  After Bignell took possession of the cards, he returned to his car for roughly five minutes where he telephoned Becker, relaying to him the names and information for Trinidad, Jose, and Valenzuela-Machado.  Bignell, while on the phone with Becker, walked back to the trailer and handed the phone to Trinidad.  Given these historical facts, the district court inferred Bignell had not returned the cards before Trinidad's conversation with Becker.  Giving "due weight to inferences drawn from those facts by resident judges and local law enforcement officers," United States v. Gomez, 312 F.3d 920, 923 (8th Cir. 2002), we accept the district court's finding as a reasonable inference.

[6]The district court also held, alternatively, Trinidad's statements over the phone to Becker were made involuntarily and while "in custody" for purposes of Miranda v. Arizona.  Although the government asserts error in the district court's conclusion that Trinidad's statements were involuntary, we need not review the district court's voluntariness determination because our conclusion that Trinidad was illegally seized is ultimately sufficient to uphold the district court's suppression order.  The government does not challenge the district court's determination that Trinidad was in custody.  Therefore, we decline to review and express no opinion on the district court's conclusions that  Trinidad's statements to Becker were involuntary and made while in custody.

-12-

III

Having concluded that Trinidad was illegally seized without reasonable suspicion of wrongdoing, we must next examine whether the district court erred, as the government asserts, when the court determined the "fruit of the poisonous tree" doctrine necessitated suppression of the physical evidence discovered during the search of Trinidad and Jose's residence.

The exclusionary rule "reaches not only primary evidence obtained as a direct result of an illegal search or seizure . . . but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." Segura v. United States, 468 U.S. 796, 804 (1984) (internal marks omitted).[7]

The government argues that under the authority of United States v. Patane, 542 U.S. 630 (2004), suppression is inappropriate in this case. In Patane, the defendant was lawfully arrested for violating a restraining order. Id. at 635. After his arrest, a police officer attempted to read the defendant his Miranda rights, but was interrupted. Id. Responding to a question by the police officer, the defendant admitted there was a firearm in his bedroom. Id. The police officer seized the firearm. Id. The Court held that although the defendant's statement about the location of the gun must be suppressed, the gun itself was admissible. Id. at 642.[8] In so doing, the Court

---

[7]Evidence obtained as a result of a constitutional violation may still be admissible if the later discovery is significantly attenuated from the primary violation, see, e.g., Brown v. Illinois, 422 U.S. 590, 604-05 (1975), if the later discovery was inevitable, see, e.g., Nix v. Williams, 467 U.S. 431, 446 (1984), or if the later discovery was supported by an independent, taint-free source, see, e.g., Murray v. United States, 487 U.S. 533, 539-41 (1988). The government does not argue any of these exceptions to the fruit of the poisonous tree doctrine apply in this case.

[8]The reasoning behind Patane's holding is difficult to follow due to the fractured opinion issued by the Supreme Court. A three-judge plurality reasoned

-13-

announced a rule that the lack of a <u>Miranda</u> warning does not justify the suppression of the physical evidence seized pursuant to a search warrant derived from a voluntary "un-warned" statement.  <u>Id.</u>

We find <u>Patane</u> inapplicable here.  Rather, we are guided by <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963).  In <u>Wong Sun</u>, law enforcement officers entered a man's residence without a warrant, in violation of the Fourth Amendment.  <u>Id.</u> at 474.  Once inside, the owner of the residence made an incriminating statement to police–telling the police he knew someone who sold narcotics.  <u>Id.</u>  Acting on the statement, the police went to the home of the second man and discovered drugs.  <u>Id.</u> at 475.  The Supreme Court held the drugs must be suppressed.  <u>Id.</u> at 488.  The Court reasoned (1) the warrantless entry into the first home was an illegal search, (2) the admission of the owner of the first home as to the identity of the drug dealer was the direct result of the illegal search, and not the result of "an intervening independent act of a free will," <u>id.</u> at 486, and (3) the drugs were found as a direct result of the admission, <u>id.</u> at 488.

Although <u>Patane</u>, like this case, involved a <u>Miranda</u> violation,[9] the similarities end there.  In <u>Patane</u>, the unwarned statements were made after a lawful arrest. <u>Patane</u>, 542 U.S. at 635.  In this case, by contrast, Trinidad's unwarned statements to Becker were themselves fruits of an illegal seizure.  Applying <u>Patane</u>'s rule in this context would swallow up the entirety of the fruit of the poisonous tree doctrine.

_____

<u>Miranda</u> is not violated until the prior testimony is admitted at trial.  <u>Id.</u> at 641.  A concurrence written by Justice Kennedy and joined by Justice O'Connor stated that "[i]n light of the important probative value of reliable physical evidence, it is doubtful that exclusion can be justified by a deterrence rationale sensitive to both law enforcement interests and a suspect's rights during an in-custody interrogation."  <u>Id.</u> at 645 (Kennedy, J., concurring).

[9]The government does not dispute the district court's conclusion that Trinidad's unwarned statements made to Becker at the Platte County jail ran afoul of <u>Miranda</u>.

Here, like in <u>Wong Sun</u>, the initial constitutional violation was a Fourth Amendment violation. Trinidad was illegally seized without reasonable suspicion, which led directly to his phone conversation with Becker about the details of his immigration to the United States. The phone conversation supplied the only basis to arrest Trinidad, and the arrest led directly to Trinidad's subsequent admission he had entered the United States illegally using fraudulent documents. Finally, the warrant application to search Trinidad and Jose's residence for the fraudulent documents was supported by Trinidad's admissions to Becker.[10]

Therefore, the district court did not err when it concluded the fruit of the poisonous tree doctrine necessitated suppression of evidence discovered during the search of Trinidad and Jose's residence.

IV

For the foregoing reasons, we affirm.

---

[10]The lone affidavit supporting the warrant application also referred to Jose's admission to Becker over the phone that he (Jose) was an illegal alien. The government does not quarrel with the district court's finding that Jose's admission is itself fruit of the poisonous tree because Bignell illegally entered the brothers' residence to hand the phone to Jose after twice being denied consent to enter the trailer.

-15-

WOLLMAN, Circuit Judge, dissenting.

Because I believe that the magistrate judge's factual findings and legal conclusions find support in the record, I would reverse the district court's judgment and hold that the items seized during the warrant-based search are admissible at trial.

My disagreement with the court's holding lies not with its factual recitation of the events that culminated in the arrest and detention of the defendants, but with its conclusion that the facts require a holding that Trinidad was seized by the time he spoke with Becker on the cell phone. I agree with the court that the first two of the Griffith factors support the government's argument that the interaction between Trinidad, Jose, and the officers remained a consensual encounter throughout its duration. I would hold, however, that the remaining Griffith factors, when viewed in the light of the attendant circumstances, do not support a conclusion that a seizure occurred.

First, the fact that Trooper Hicks described his role as "security" does not count for much in my estimation in light of the fact that he had no contact with Trinidad and Jose upon arriving at the scene. He testified that, after parking at the front of the trailer, he watched the back portion of the trailer and was not in a position to observe what was happening at the scene. True enough, he also testified that it would have been his job to stop anyone who came from the trailer, but there is no evidence that either Trinidad or Jose was aware of this fact. Indeed, as to them, Trooper Hicks could justifiably be described as "little more than [a] passive observer[]." United States v. White, 81 F.3d 775, 779 (8th Cir. 1996).

I give no weight to the fact that two of the officers were visibly armed, since most members of the public expect law enforcement officers to be armed, and there is no evidence that either of these officers ever by word or gesture in any way indicated that the use of those side arms was being contemplated.

-16-

This brings us to the two factors that the court concludes most heavily weigh in favor of a conclusion that a seizure occurred. As the court says, Bignell told Trinidad during the course of the encounter that he believed that Trinidad and Jose were drug dealers. This statement was made in response to Trinidad's inquiry as to what Bignell wanted and not in an introductory, accusatory manner. Trinidad's response to Bignell's statement was to deny the allegation and to once again deny Bignell's request for consent to enter the trailer, hardly the response of one who believed that he was powerless to do other than to comply with the officer's requests. I agree with the magistrate judge's analysis and conclusion on this issue:

> Up to this point, the record does not suggest that Trinidad and Jose were coerced into talking to the police or that they were susceptible to any pressure that may have been asserted by the officers. Indeed, they affirmatively refused to allow the officers into the residence or to search the residence.

Turning to the matter of the unreturned identification cards, one must weigh the significance of that fact in the light of the circumstances. In contrast to the situation in Florida v. Royer, there is no evidence that Trinidad and Jose were about to catch a soon-to-depart airline flight or to undertake a cross-country journey. Accordingly, I place no significance on the fact that their identification cards were not returned to them before Trinidad's telephone conversation with Becker.

In summary, I agree with the magistrate judge's conclusion that Trinidad had not been seized at the time he was handed the cell phone by Bignell and thereafter conversed with Becker.

Likewise, I agree with the magistrate judge's finding that Trinidad's statements to Becker at the jail were voluntarily made and its conclusion that in light of the holding in United States v. Patane, the evidence seized pursuant to the warrant should be held to be admissible at trial.

-17-

Having reviewed the challenge to the sufficiency of the warrant set forth in Jose's brief, I conclude that it is without merit.

_____