# IN THE COURT OF APPEALS OF IOWA

No. 19-2081
Filed January 21, 2021

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**CLINTON JOEL CONKEY,**
        Defendant-Appellant.

_____

        Appeal from the Iowa District Court for Woodbury County, Jeffrey A. Neary,

Judge.

        A defendant appeals his convictions and sentences for several drug-related

offenses and carrying a dangerous weapon. **AFFIRMED IN PART, REVERSED**

**IN PART, AND REMANDED FOR RESENTENCING.**

        Priscilla E. Forsyth, Sioux City, for appellant.

        Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney

General, for appellee.

        Considered by Doyle, P.J., and Tabor and Ahlers, JJ.

**TABOR, Judge.**

Clinton Conkey appeals his convictions and sentences in three consolidated drug cases.[1] All three cases involved warrantless searches by law enforcement officers. Conkey contends the district court erred in denying his motions to suppress evidence in each case. He also argues the court erred in determining his sentence.[2] Finding exceptions to the warrant requirement in the first two cases (FECR 101281 and FECR 102173), we affirm those four convictions. But because the police officer lacked reasonable suspicion to detain Conkey in the third case (FECR 103790), we reverse that suppression ruling and remand for the court to dismiss those two convictions. After those dismissals, the court must resentence Conkey.

## I.      Scope and Standards of Review

We review Conkey's challenges to the suppression rulings de novo because his claims implicate constitutional issues. *See State v. Baker*, 925 N.W.2d 602, 609 (Iowa 2019). Under this standard, we conduct an independent review of the totality of the circumstances in the record. *Id.* In doing so, we may consider both

---

[1] The first case (FECR101281), stemming from a conversation with Conkey on his bicycle in May 2018, included convictions for possession of methamphetamine, possession of marijuana, and unlawful possession of a prescription drug. The second case (FECR102173), arising from a traffic stop in September 2018, also involved a conviction for possession of methamphetamine. The third case (FECR103790), relating to an encounter with Conkey on foot in February 2019, included convictions for possession of methamphetamine and carrying a dangerous weapon.

[2] Following a consolidated bench trial on the minutes of evidence, the court found Conkey guilty on all six counts and sentenced him to a prison term not to exceed ten years. At the sentencing hearing, the court suspended the sentence and granted Conkey a probationary term of four years.

the evidence presented at the suppression hearing and evidence at trial. *State v. Carter*, 696 N.W.2d 31, 36 (Iowa 2005). We give deference to the court's factual findings, though they do not bind us. *Id.*

We review sentences for correction of errors at law. *State v. Formaro*, 638 N.W.2d 720, 723 (Iowa 2002). "We will not reverse the decision of the district court absent an abuse of discretion or some defect in the sentencing procedure." *Id.*

## II.    Analysis

Conkey challenges all three suppression rulings. In separate divisions, we will discuss each fact pattern and assess the constitutional arguments for suppressing the evidence leading to Conkey's convictions.

**First case.** In May 2018, Sioux City Officer Nathan Niehus was patrolling in an unmarked car when he received a radio call reporting suspicious activity just before midnight. Another officer informed Niehus that someone was riding a bicycle down the sidewalk without "any type of illumination," wearing all black clothing and a backpack. When Niehus spotted the cyclist from his car, he decided to follow.

In the lot of a nearby gas station, Officer Niehus parked his car and approached the cyclist, later identified as Conkey. Wearing plain clothes, Niehus showed his badge and asked if he could speak with Conkey. In response, Conkey "rode his bike over to where [Niehus] was standing" and chatted. During their "brief conversation," Niehus asked Conkey for identification to run a records check. Conkey complied.

Soon Officer Alan Schmeckpeper joined them. Schmeckpeper asked Conkey if he had any weapons. Conkey said he had a knife. Based on Conkey's

statement, Schmeckpeper patted him down for weapons. During the pat down, Schmeckpeper removed a knife from Conkey's right pants pocket.

After discovering the pocket knife, Officer Schmeckpeper asked if he could search Conkey's backpack.[3] The officer also inquired whether "there was anything illegal . . . or anything stolen in his backpack." Conkey replied "there was" but that "he wasn't out burglarizing anything." Conkey then took off his backpack and handed it to the officer. The backpack search unearthed several incriminating items: a grinder containing raw marijuana, a glass pipe with "white haze residue," four pocket knives, and two prescription bottles of cough syrup issued to a different person.

Based on that evidence, Officer Niehus searched Conkey for drugs. As that search unfolded, Niehus found a sock in Conkey's front left pocket. After touching "a hard substance that felt like a rock," Niehus reached into the sock and pulled out a methamphetamine crystal. Niehus also took out Conkey's wallet. When Niehus opened it, he found "a small cellophane wrapper that contained a green leafy substance," as well as "a small Ziploc baggy that contained a small amount of crystalline substance." The officers later confirmed that the substances were marijuana and methamphetamine.

In a July 2018 trial information, the State charged Conkey with possession of methamphetamine, third offense, and possession of marijuana, third offense,

---

[3] As to this request, Officer Schmeckpeper stated: "From my experience as a police officer I found that there are numerous individuals involved in drug distribution and drug use that will carry a backpack with them to store their items of paraphernalia and also drugs." Then he added that "tools used for burglaries would also be stored in backpacks."

both in violation of Iowa Code section 124.401(5) (2018), and unlawful possession of a prescription drug, in violation of Iowa Code section 155A.21(1). Conkey moved to suppress the evidence found during the search of his backpack, contending the law enforcement officers lacked reasonable suspicion to conduct an investigatory stop. Before any hearing, the parties stipulated that the court could rely on the minutes of evidence when deciding the suppression motion. The court denied the motion, finding the police did not seize Conkey and Conkey consented to searching the backpack.

On appeal, Conkey argues police had neither reasonable suspicion nor probable cause to justify stopping him while he was riding his bicycle on the sidewalk. He claims that stop was unlawful because "a person choosing to wear black on a bike with a backpack is not enough to give rise to a reasonable suspicion that criminal activity is afoot." As a corollary argument, Conkey claims the search of his backpack violated the Fourth Amendment of the U.S. Constitution, as well as article I, section 8 of the Iowa Constitution.

To counter, the State contends (1) the stop was not a "seizure" triggering Fourth Amendment scrutiny and (2) the backpack search was consensual.

Both the state and federal constitutional provisions protect people from unreasonable searches and seizures.[4] U.S. Const. amend. IV; Iowa Const. art. I, § 8. But before considering these protections, we assess whether the police officers "seized" Conkey. *See State v. Fogg*, 936 N.W.2d 664, 667 (Iowa 2019).

---

[4] Because Conkey does not advance a distinct analytical framework for his claims under the Iowa Constitution, we opt to apply the general federal framework for searches and seizures. *See Baker*, 925 N.W.2d at 609.

We must make this threshold assessment because not every police interaction is a seizure in the constitutional sense. *State v. Smith*, 683 N.W.2d 542, 546 (Iowa 2004).

For instance, "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). Even when officers have no basis for suspecting a particular individual, they may pose questions and ask for identification—provided they do not use coercive means to induce cooperation. *Id.*; *see also State v. Reinders*, 690 N.W.2d 78, 82 (Iowa 2004). An encounter with police "remains consensual and does not trigger a reasonable suspicion requirement" unless "an officer restrains one's liberty by means of physical force or other show of authority." *Smith*, 683 N.W.2d at 547. The test is whether "a reasonable person would feel free 'to disregard the police and go about his business.'" *State v. Wilkes*, 756 N.W.2d 838, 843 (Iowa 2008) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).

Challenging the district court's rationale, Conkey insists his interaction with Officer Niehus was not consensual. He claims the officer's action "wasn't just a casual walking up to someone walking down the street and engaging them in a conversation" but was instead, "more akin to the stopping and seizure of someone in a motor vehicle" because he was riding his bicycle. We reject this argument.

Officer Niehus did nothing more than approach Conkey and ask for identification. In turn, Conkey willingly responded to the officer's questions and provided the requested information. From our reading of the record, their meeting

was analogous to cases where police approached a parked vehicle or an individual on foot. *See id.* at 844 (finding encounter was consensual when officer pulled in behind a parked vehicle to speak with occupant rather than stopping moving vehicle); *State v. Harlan*, 301 N.W.2d 717, 720 (Iowa 1981) (same); *see also Reinders*, 690 N.W.2d at 83 (explaining police questioning was consensual though officers "approached the defendant on foot as he walked through a K-Mart parking lot"). In those cases, the critical test was whether the totality of the circumstances showed "no reasonable individual would have felt free to simply walk away and refuse to answer the officer's questions." *Reinders*, 690 N.W.2d at 83.

Applying that test, no seizure occurred when Officer Niehus approached Conkey and asked for identification. The record shows Niehus wore plain clothes, walked on foot, and flashed his badge only to verify his identity. Perhaps most important, it was Conkey who voluntarily "rode his bike over" to speak with Niehus. Only then did Niehus ask for identification. This conduct did not create a seizure. *See Wilkes*, 756 N.W.2d at 843 (reiterating officer's "mere showing of a badge" and asking questions do not prove seizure). Likewise, the record lacks "objective indices of police coercion." *Id.* By all accounts, Niehus "did not use physical force or show authority in any manner." *Id.* at 844. He did not restrict Conkey's movement, use a threatening or commanding tone, or display any weapons. A reasonable person in Conkey's shoes would have felt free to go on their way. *See Smith*, 683 N.W.2d at 547 (finding no seizure where defendant voluntarily gave identification). The initial stop did not implicate the Fourth Amendment.

We next address the propriety of searching Conkey's backpack. A warrantless search is per se unconstitutional unless a recognized exception

applies. *State v. Pettijohn*, 899 N.W.2d 1, 14 (Iowa 2017). One of those exceptions is a search conducted by free and voluntary consent. *State v. Lowe*, 812 N.W.2d 554, 572 (Iowa 2012). When the State relies on consent as an exception, it must establish by a preponderance of the evidence that (1) consent to search was given, and (2) that consent was valid. *State v. Reinier*, 628 N.W.2d 460, 465 (Iowa 2001). A person may give consent orally, as well as "by gestures and non-verbal conduct." *Id.* at 467. Like the district court, we find Conkey consented through non-verbal conduct when he handed his backpack to Schmeckpeper following the officer's request to search it.

In determining the validity of that consent, we ask whether it was voluntary. *Id.* at 465. Voluntariness is a question of fact that requires an examination of the totality of the relevant circumstances. *Id.* We consider a non-inclusive list of factors, including the presence of police coercion, deception, or threats; police "claim of authority"; defendant's knowledge of the right to refuse consent; and "existence of illegal police action just prior to the time the consent is given." *Id.*

Several factors weigh in favor of voluntariness. First, the officers did nothing illegal before Conkey gave his consent to search the backpack. The preceding pat down for weapons was justified after Conkey admitted "he had a knife and he had knives in his backpack." *See State v. Leaton*, 836 N.W.2d 673, 676 (Iowa Ct. App. 2013) (reiterating officer may conduct reasonable search for weapons if officer has reason to believe person is armed and dangerous (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968))). Second, in asking to search, Officer Schmeckpeper did not use any coercive or deceptive tactics. And third, the officer did not assert any claim of authority to search.

The only factor weighing against voluntariness is the officers' failure to inform Conkey of his right to refuse consent. But knowledge of that right "is not a prerequisite to establishing . . . voluntary consent; it is merely a factor in determining its voluntariness." *State v. Prusha*, 874 N.W.2d 627, 631 (Iowa 2016) (alteration in original) (quoting *State v. Folkens*, 281 N.W.2d 1, 4 (Iowa 1979)). Based on the totality of these circumstances, the State met its burden in showing Conkey gave his voluntary consent to the search of the backpack. Thus we uphold the suppression ruling and affirm Conkey's convictions for possession of methamphetamine, possession of marijuana, and unlawful possession of a prescription drug.

**Second case.** In September 2018, Sioux City Police Officer Christopher Eral was on routine patrol when he stopped a car in which Conkey was a passenger.[5] During the traffic stop, the officer noticed that both the driver and Conkey appeared "very nervous." Conkey was sweating, his hands shook, and he mumbled in response to the officer's questions. Suspecting their nervousness signaled the presence of contraband, Officer Eral asked "if there were any weapons or drugs in the vehicle"; they said no. Still believing something was amiss, the officer called for a K-9 unit.

About five minutes later, Officer Paul Yaneff arrived with his drug dog. Yaneff thought Conkey "looked very familiar from prior dealings." And like Officer Eral, the K-9 officer noted Conkey's unusual behavior. Officer Yaneff suspected Conkey was high on methamphetamine based on "his body tremors, cotton mouth,

---

[5] The driver, Conkey's cousin, had a "heavily cracked" windshield and a broken rear window.

and the way his eyes were dilated." The officers directed the driver and Conkey to step out of the vehicle. Once Conkey was outside, Officer Yaneff asked "if he had anything illegal on his person, any guns, drugs, knives." Conkey replied "he had a knife on him." Then Yaneff asked Conkey to turn around, so he could pat him down and take possession of the knife. During the pat down, the officer warned Conkey several times to stop reaching for his pockets.

After removing the knife from Conkey's back pants pocket, Officer Yaneff handcuffed Conkey and informed him he was being detained.[6] Yaneff then guided his drug dog around the car. At the front door on the passenger's side, the dog gave "a positive response to the odor of narcotics." After that alert, Yaneff searched Conkey's person, finding a stainless steel vial containing a plastic baggie of methamphetamine.

With the first case pending, the State again charged Conkey with possession of methamphetamine, third offense. And Conkey again moved to suppress the drug evidence found in his possession—this time alleging the warrantless search during the traffic stop was unsupported by probable cause. The two officers testified at the suppression hearing. In February 2019, the district court denied the motion based on three findings: (1) the traffic stop was not unreasonably prolonged; (2) probable cause justified the dog sniff of the vehicle; and (3) separate probable cause justified searching Conkey for contraband.

---

[6] Officer Yaneff explained he detained Conkey without formally arresting him because "he was acting so nervous and he had weapons on him and kept on trying to reach down for it when I told him not to."

Conkey now claims the district court erred in denying his motion to suppress. He argues the search was unconstitutional because the dog's alert, at most, established probable cause to search the car.[7] By contrast, the State relies on an independent probable cause theory, claiming the officers had probable cause to search Conkey, separate from the car, based on their trained observations during the traffic stop.

True, "probable cause to search a *car* does not justify the search of a *passenger*." *State v. Horton*, 625 N.W.2d 362, 365 (Iowa 2001) (citing *United States v. Di Re*, 332 U.S. 581, 584–87 (1948)). But that principle is but a starting point. A separate search of a passenger is constitutional if police have independent probable cause to justify searching that person. *See State v. Merrill*, 538 N.W.2d 300, 302 (Iowa 1995) (upholding search of passenger when officer smelled burnt marijuana on person and saw him hiding something in his hand). The existence of independent probable cause boils down to whether "a reasonably prudent person would believe that evidence of a crime will be discovered in the place to be searched." *State v. Moriarty*, 566 N.W.2d 866, 868 (Iowa 1997). We consider the totality of circumstances, including "the sum total . . . and the synthesis of what the police have heard, what they know, and what they observe as trained officers." *State v. Predka*, 555 N.W.2d 202, 207 (Iowa 1996) (quoting *State v. Edgington*, 487 N.W.2d 675, 678 (Iowa 1992)). An officer's observations

---

[7] Conkey does not contest the legality of the traffic stop, its duration, or the dog sniff, likely because those actions did not violate his rights. *See State v. Tague*, 676 N.W.2d 197, 201 (Iowa 2004) ("When a peace officer observes a violation of our traffic laws, however minor, the officer has probable cause to stop a motorist."); *State v. Bergmann*, 633 N.W.2d 328, 334 (Iowa 2001) ("[A] dog sniff that occurs outside a vehicle is not a search under the meaning of the Fourth Amendment.").

of "furtive movements coupled with additional suspicious circumstances can provide sufficient grounds for a warrantless search." *Merrill*, 538 N.W.2d at 302 (citing *State v. Riley*, 501 N.W.2d 487, 489 (Iowa 1993)).

With that test in mind, we turn to the facts underlying Conkey's search. At the suppression hearing, Officer Yaneff recalled three key observations that made him suspect criminal activity. First, he noted Conkey exhibiting common signs of methamphetamine use.[8] Second, Yaneff testified to his "prior dealings" with Conkey—the most recent incident also involving methamphetamine. Third, Yaneff's dog, which was certified in drug detection, alerted at the passenger side front door. But the officer's search of the car revealed nothing. For his part, Officer Eral noticed Conkey "was shaking so bad, he bent his cigarette."

Considering these circumstances, it was reasonable for the officers to believe—based on their training and experience—that Conkey was under the influence and possessed drugs during this interaction. Deferring to the officers' expertise, we find Conkey's behavior and abnormal physical symptoms contributed to probable cause. *See Predka*, 555 N.W.2d at 207 (noting defendant's "nervous state and heavy breathing" were legitimate factors in determining probable cause to search). Plus, the dog alerted to drugs near the front passenger door where Conkey had been sitting. So when the search of the car proved fruitless, it was reasonable for Officer Yaneff to believe that Conkey was in personal possession of drugs. *See Horton*, 625 N.W.2d at 367 (determining officers could reasonably believe a passenger "was involved in the illegal use or

---

[8] Officer Yaneff testified he is trained in identifying people under the influence of illegal substances.

possession of marijuana" when presence of marijuana was found in car). For these reasons, sufficient probable cause justified the passenger search. The district court properly denied Conkey's motion. And thus we affirm Conkey's conviction for possession of methamphetamine found during that traffic stop.

**Third case.** In February 2019, Sergeant Dane Wagner was patrolling near a convenience store to follow up on a tip about potential drug transactions. As an undercover officer, Wagner was in plain clothes and driving an unmarked car. Around 3:00 a.m., Wagner noticed someone "walking between two houses" with "what looked like a wheelbarrow or like a plastic garden cart." Suspecting the person might have "burglarized something in the area or [was] just simply stealing from a yard," Wagner decided to approach him.

On foot, Wagner identified himself as a police officer, displayed his badge, and shined his flashlight. After the person acknowledged the officer, Wagner asked for name and identification. As Conkey looked for his identification, Wagner peered into the wheelbarrow, which held a tire and "small shop light." Wagner also noticed Conkey was carrying a drawstring bag and "a silver canister about the size of a shotgun shell . . . in his fifth pocket or the coin pocket of his jeans." It was that canister which drew Wagner's attention. According to the officer, it resembled "a small metal container commonly used to store drugs." Invoking his nineteen-year career working in a narcotics unit, Wagner stated: "The only time I have ever run into those in law enforcement is when I've been a part of drug search warrants or drug seizures. I've never seen someone just driving down the street that carried them and actually used them for what they are intended for."

After making these observations, Wagner inquired where Conkey was coming from and where he got the wheelbarrow. Conkey explained he was walking from his friend's house and "had his cart there, so he grabbed it and was just bringing it home." When Wagner asked for the friend's name, Conkey replied "Jesus" but could not recall Jesus's last name. Conkey offered to take Wagner to his friend's apartment so Wagner could speak with the friend and confirm the cart belonged to Conkey. Wagner declined the offer.

By then, Wagner had run a records check, which returned no outstanding warrants for Conkey. But instead of returning his identification and parting ways, Wagner asked Conkey about the silver canister.[9] Conkey said "it was a matchstick container." Wagner asked if there were matches in it. Conkey responded "there wasn't." Wagner recalled that while Conkey was answering questions, he moved the canister out of his coin pocket and "put it into the bigger pocket on the right-hand side of his pants that he was wearing, basically taking it out of my sight."

After those inquiries, Sergeant Wagner asked to look inside the canister. Conkey replied "he didn't feel comfortable doing that." Undeterred, Wagner asked two more times, to which Conkey repeated "he still just didn't feel comfortable." Wagner told Conkey that if he had nothing to hide, he would have just shown him and been on his way.

---

[9] The officer testified the container was "very unique" and explained that "if you are not familiar with them, you have a hard time figuring out how to open them because they have a weird arm on them. You have to unscrew them and then they flip."

A few minutes later, three more officers walked up. Only then did Wagner ask Conkey if he had any weapons.[10] Conkey admitted he had a knife in his pocket and then tried to reach for it. Wagner stopped him, saying "that I would like to acquire it myself just to make sure that we didn't have any confusion about who possessed the knife at any time." After that find, Wagner directed Officer Casey McBride to conduct a more thorough pat down of Conkey for other weapons. While patting him down, Officer McBride "felt a hard object" near Conkey's back right hip that "kept going down the back side of his leg." McBride asked Conkey what he was hiding. Conkey said it was a machete.

After the machete discovery, Sergeant Wagner circled back to the silver matchstick container. He asked Conkey a fourth time if he could look inside. When Conkey declined, Wagner arrested Conkey for carrying a dangerous weapon and searched the matchstick container incident to the arrest. When Wagner reached into Conkey's pocket, he also discovered a methamphetamine pipe. Inside the matchstick container were two bags of "a crystal-like substance," which later tested positive for methamphetamine.

In a March 2019 trial information, the State charged Conkey with possession of methamphetamine, third offense, and carrying a concealed and dangerous weapon, in violation of Iowa Code section 724.4(3)(a). Conkey moved to suppress the evidence seized during the pat down and the search of his matchstick container. The district court denied the motion.

---

[10] Sergeant Wagner testified he waited for backup because he avoided making physical contact with citizens in one-on-one exchanges "in case something were to be wrong or in case somebody were to want to fight or run."

In challenging this third and final suppression ruling, Conkey claims police violated his constitutional protection against unreasonable searches and seizures in three ways. First, he contends Sergeant Wagner exceeded the lawful bounds of an investigatory stop by asking unrelated questions, thereby failing to "expeditiously investigate [his] suspicion." Second, he claims the pat down for weapons was unconstitutional because police lacked reasonable suspicion to believe he was armed and dangerous. And third, he argues police lacked probable cause to search the silver matchstick container in his pocket.

In resistance, the State contends Sergeant Wagner was justified in asking Conkey about the wheelbarrow and matchstick container. The State describes an escalating encounter between the two men. As a start, the State asserts their "initial two-minute interaction did not rise to the level of a seizure." Then as their exchange continued, and Wagner saw the silver match container, the State contends the officer developed reasonable suspicion to believe Conkey was involved in criminal activity. That reasonable suspicion, in the State's view, allowed the officer to prolong the stop. That prolonged stop featured a pat down, which the State defends based on Conkey's admission that he had a knife in his pocket. And finally, the State contends the search of the canister was a constitutional search incident to arrest.

As discussed above, the threshold question in any Fourth Amendment analysis is whether a "seizure" occurred. *Fogg*, 936 N.W.2d at 668. Because police can approach citizens in public places and ask them questions without triggering constitutional scrutiny, "objective indices of police coercion must be present to convert an encounter between police and citizens into a seizure."

*Wilkes*, 756 N.W.2d at 843. Police questioning loses its consensual nature "only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Harlan*, 301 N.W.2d at 719 (quoting *Terry*, 392 U.S. at 19 n.16). If a voluntary encounter converts into a seizure, police must have reasonable suspicion or probable cause to justify the subsequent detention. *See Wilkes*, 756 N.W.2d at 844–45.

Applying these principles, we agree no seizure occurred when Sergeant Wagner approached Conkey and asked him about the wheelbarrow. In describing this initial interaction, the district court noted:

> Sergeant Wagner did not use physical force or show authority in any manner when he approached [Conkey]. He did not use harsh language or threaten him. He was in plain clothes. He did not have lights and sirens going. He merely approached [Conkey], identified himself as a police officer, and began to speak with [him].

Consistent with the court's reasoning, the record contains no objective signs of coercion to counteract the consensual nature of Conkey's responses. Because Conkey willingly answered Wagner's questions—even offering to show Wagner his friend's apartment—that early interaction and brief questioning did not implicate the Fourth Amendment.

But the nature of their encounter soon changed. As the State's argument implicitly concedes, the officer's persistent probing required evidence "raising the level of suspicion" that Conkey was engaged in illegal activity. In other words, Fourth Amendment scrutiny was triggered when the encounter lost its consensual nature, and Conkey was no longer free to disregard Sergeant Wagner and go about his business. *See Bostick*, 501 U.S. at 434.

Several factors transformed the voluntary encounter into a seizure. First, Sergeant Wagner took Conkey's identification card to check whether he had any warrants for his arrest. He did not. But the record does not show that the officer returned Conkey's identification before quizzing him about the canister. *See United States v. Villa-Gonzalez*, 623 F.3d 526, 533 (8th Cir. 2010) ("Without his identification card, a reasonable person is much less likely to believe he can simply terminate a police encounter." (citing *Florida v. Royer*, 460 U.S. 491, 503 n.9 (1983)). Second, Wagner's intensifying inquiries about the matchstick container added a coercive element to the stop. The officer told Conkey that in his experience "these containers were normally used to conceal drugs." *See id.* (explaining consensual encounters don't typically involve "inquisitorial statements" such that police use of these statements would "certainly make any encounter more coercive"). And when Conkey refused to allow a search of the container, Wagner accused Conkey of hiding something illegal—"I explained to him that I believed at this point he must have something inside of that container, otherwise, he would have simply opened it, shown me that it was empty, and he would have been on his way." Third, the police made a show of authority when three more officers appeared at the scene. *See United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008) (listing presence of several officers, the retention of the person's property, and an indication the person is the focus of an investigation as indicia of seizure). Considering the totality of these circumstances, we find Conkey was seized.

The next step is to decide whether Conkey's seizure was warranted. A temporary detention is constitutional only if the officer has "reasonable suspicion,

backed by specific and articulable facts, to believe criminal activity is afoot." *Baker*, 925 N.W.2d at 611 (citing *Terry*, 392 U.S. at 21). "Mere suspicion, curiosity, or hunch of criminal activity is not enough." *Tague*, 676 N.W.2d at 204. "The purpose of an investigatory stop is to allow a police officer to confirm or dispel suspicions of criminal activity through reasonable questioning." *State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002). We evaluate the totality of the circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Id.* at 642 (quoting *United States v. Hall*, 525 F.2d 857, 859 (D.C. Cir. 1976)). A person's refusal to cooperate, standing alone, does not amount to reasonable suspicion. *State v. Corbett*, 758 N.W.2d 237, 241 (Iowa Ct. App. 2008).

On appeal, the State contends reasonable cause for the detention arose from Wagner's belief that matchstick containers were "commonly used" to store drugs, coupled with Conkey's act of moving the container to a different pocket while being questioned. We disagree. These two facts do not provide reasonable cause to believe Conkey was involved in a drug-related crime.[11]

At the suppression hearing, Wagner recalled more extensively questioning Conkey after noticing the silver canister in his pocket. Wagner testified that in his

---

[11] The focus of Sergeant Wagner's investigation changed during the course of the interaction. When Wagner first approached Conkey, he suspected Conkey "may have been out stealing a wheelbarrow." The time of year, the hour of the night, the location of the encounter, and the items in the wheelbarrow sparked the officer's curiosity. But objectively, the officer developed no additional grounds to pursue a theft investigation. And subjectively, the officer testified that he only "continued to have a conversation" with Conkey when "this silver cylinder ended up popping up." The investigation then focused on Wagner's belief that Conkey was "in possession of some type of illegal narcotics."

experience as a drug investigator, he had never seen "these particular style containers" used "for what they are intended for." Rather, he only ran into them during drug seizures. But Wagner's association of matchstick containers with drug busts did not provide a particularized or objective basis for suspecting Conkey possessed drugs that night. Because any person could legally possess a matchstick container without provoking a suspicion of drug activity, a generalized presumption about the containers themselves, without more, does not amount to reasonable suspicion. *See Tague*, 676 N.W.2d at 205 (listing scenarios where a vehicle, in "an isolated incident," could cross an edge line without amounting to reasonable suspicion of intoxication or fatigue).

Take the example of plastic baggies, a more infamous receptacle for holding drugs. *See Carter*, 696 N.W.2d at 38 (noting "[o]ther courts have found that a plastic baggie is a commonly used container for narcotics and when seen in an unusual setting can tip the scales in favor of probable cause for a search"). Not every sighting of a baggie supports reasonable suspicion or probable cause to search. *See State v. Sweeney*, No. 07-0336, 2007 WL 4553475, at *5 (Iowa Ct. App. Dec. 28, 2007) (striking down search based on "baggie in Sweeney's pocket, his refusal to say what was in it, and Officer Johnson's assertion that illegal drugs are commonly carried in plastic baggies").

Beyond the container, the lack of objective factors to support reasonable suspicion is apparent from Wagner's own testimony:

> Q: Would you describe—or can you describe what Mr. Conkey's demeanor was while you were dealing with him? A: He initially was fairly casual with me. As I—as I asked him questions, he became—I don't know if I would use the word "agitated." More nervous, I think—the longer we spoke.

> And he—he just—he was—I don't know.  It was very cold; so I couldn't get a good read on whether he was completely nervous or we were both shivering.  It was hard to tell actual body movements.

The fact that Conkey moved the matchstick container into a different pocket while Wagner questioned him does not change our outcome.  Admittedly, Conkey's conduct could be viewed as evasive.  *See generally Merrill*, 538 N.W.2d at 302 (recognizing that "furtive movements coupled with additional suspicious circumstances can provide sufficient grounds for a warrantless search").  But the movement was suspicious only from Wagner's subjective view that Conkey was hiding illegal drugs in his matchstick container.  On this record, the State did not establish that reasonable cause existed to detain Conkey.  *See State v. Salcedo*, 935 N.W.2d 572, 580 (Iowa 2019) (holding permissible stop became unlawful when officer unreasonably prolonged conversation with suspect).

Because the investigatory stop violated Conkey's constitutional protection against unreasonable seizure, all physical evidence flowing from the stop must be suppressed.  *See Tague*, 676 N.W.2d at 206.  Thus, we need not address Conkey's remaining claims, as those searches occurred after the unlawful seizure. We reverse the suppression ruling in this third case and remand for entry of judgment voiding the related convictions for possession of methamphetamine and carrying a dangerous weapon.

We remand for resentencing on the remaining four convictions.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR RESENTENCING.**